UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| CHRIMAR SYSTEMS, INC.<br>d/b/a CMS TECHNOLOGIES, INC.,<br>a Michigan Corporation,<br><br>        Plaintiff,<br><br>   v.<br><br>POWERDSINE LTD., an Israel Corporation,<br>and POWERDSINE CORP., a New York<br>Corporation,<br><br>        Defendants. | Case No. 01-74081<br>Hon. Avern Cohn |
| CHRIMAR SYSTEMS, INC.<br><br>        Plaintiff,<br><br>   v.<br><br>FOUNDRY NETWORKS, INC.,<br><br>        Defendant. | Case No. 06-13936<br>Hon. Avern Cohn |
| CHRIMAR SYSTEMS, INC.<br><br>        Plaintiff,<br><br>   v.<br><br>D-LINK SYSTEMS, INC.,<br><br>        Defendant. | Case No. 06-13937<br>Hon. Avern Cohn |

**DEFENDANTS' JOINT MOTION FOR APPLICATION OF COLLATERAL ESTOPPEL TO BIND PLAINTIFF TO FACT ISSUES DECIDED REGARDING "GREEN BOOK" AND THE "AMD APPLICATION NOTE" PRIOR ART, AND INVALIDITY OF CLAIM 1 OF THE '260 PATENT**

# TABLE OF CONTENTS

**Page(s)**

I.   FACTUAL BACKGROUND ........................................................................... 2

    A.   The Cisco Litigation and Claim 1 ......................................................... 2

           1.   Cisco's Motion for Summary Judgment of Invalidity ............................... 4

    B.   The Court and Special Master Both Agree that Green Book and the AMD Application Note Anticipate Claim 1 .................................................... 5

    C.   The Reasons the Court Ruled that the Prior Art Anticipated Claim 1 .................. 6

    D.   The Court Recognized that Its Cisco Findings Apply to These Cases ................. 9

II.  DEFENDANTS SATISFY THE LEGAL STANDARDS FOR APPLICATION OF DEFENSIVE, NON-MUTUAL ISSUE PRECLUSION ........................................... 10

    A.   The Sixth Circuit's Four Part Test for Application of Collateral Estoppel ......... 11

    B.   Chrimar Is Collaterally Estopped from Re-Litigating that Green Book and the AMD Application Note Were Prior Art Printed Publications ...................... 11

    C.   Chrimar Is Collaterally Estopped from Relitigating that Green Book and the AMD Application Note Are Enabled, and Disclose Every Element of Claim 1 .................................................................................... 15

    D.   Chrimar Is Collaterally Estopped from Relitigating that Green Book Was Known and Used for Purposes of 35 U.S.C. § 102(a) .......................... 19

III. CONCLUSION .......................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Aircraft Braking Sys. Corp. v. Local 856, Int'l Union*
    97 F.3d 155 (6th Cir. 1996) ...........................................................................14

*Am. Postal Workers Union Columbus Area Local AFL-CIO v. U.S. Postal Serv.*
    736 F.2d 317 (6th Cir. 1984) .........................................................................14

*Cf. Kyocera Wireless Corp. v. ITC*
    545 F.3d 1340 (Fed. Cir. 2008)......................................................................14

*Chrimar Sys., Inc. v. Cisco Sys., Inc.*
    318 F. Supp. 2d 476 (E.D. Mich. 2004)................................................... passim

*Dana v. E.S. Originals, Inc.*
    342 F.3d at 1323 .............................................................................11, 15, 19

*Employees Own Fed. Credit Union v. City of Defiance*
    752 F.2d 243 (6th Cir. 1985) .........................................................................15

*In re Freeman*
    30 F.3d 1459 (Fed. Cir. 1994)........................................................................14

*Freshman v. Atkins*
    269 U.S. 121 (1925).........................................................................................2

*Glaxo, Inc. v. Novopharm Ltd.*
    52 F.3d 1043 (Fed. Cir. 1995)........................................................................18

*Molinaro v. Fannon/Courier Corp.*
    745 F.2d 651 (Fed. Cir. 1984)........................................................................19

*Montana v. United States*
    440 U.S. 147 (1979).......................................................................................14

*United States v. Cinemark USA, Inc.*
    348 F.3d 569 (6th Cir. 2003) ....................................................................11, 20

*United States v. Mendoza*
    464 U.S. 154 (1984).......................................................................................10

## TABLE OF CONTENTS
### (continued)

Page

*Westwood Chem., Inc. v. Molded Fiber Glass Body Co.*
498 F.2d 1115 (6th Cir. 1974) ...................................................................................14

## FEDERAL STATUTES

35 U.S.C. § 102.............................................................................................................6

35 U.S.C. § 102(a) ................................................................................................ passim

35 U.S.C. § 102(b) ................................................................................................ passim

35 U.S.C. § 102(g)(2) .................................................................................................4, 5

Fed. R. Civ. P. 5(d) ....................................................................................................23

Fed. R. Evid. 201 ..........................................................................................................2

### Other Authorities

*Restatement (Second) of Judgments* § 13.......................................................14, 15, 19

Defendants PowerDsine Ltd., PowerDsine Corp., Foundry Networks, Inc., D-Link Systems, Inc, (collectively "Defendants") move this Court for an order applying non-mutual defensive collateral estoppel binding Plaintiff Chrimar Systems, Inc. ("Chrimar") to this Court's prior partial summary judgment ruling in *Chrimar Sys., Inc. v. Cisco Sys., Inc.*, 318 F. Supp. 2d 476, 492-508, 516 (E.D. Mich. 2004) (the "*Cisco*" ruling) holding that claim 1 of U.S. Patent No. 5,406,260 ("the '260 patent) is invalid as anticipated pursuant to 35 U.S.C. § 102(a) and (b). Because there is a significant overlap in claim language between claim 1 and the claims asserted by Chrimar against the Defendants (i.e. claims 14, 16 and 17), application of collateral estoppel to this Court's prior *Cisco* ruling likely will greatly simplify the validity issues involved in these cases.

This Court already ruled that the following two prior art references (collectively referred to as "the FDDI publications") independently disclosed claim 1 element-for-element, were enabling, and were published, known and in use one year before the filing of the '260 patent:

- Advanced Micro Devices, *et al, An Interoperable Solution for FDDI Signaling Over Shielded Twisted Pair*, ANSI X3T9.5 Working Group Standards Proposal, May 21, 1991 ("Green Book")[1]; and

- Eugen Gershon, *FDDI on Copper with AMD PHY Components*, Advanced Micro Devices Publication No. 15923, June, 1991 (the "AMD Application Note").[2]

This Court received hundreds of pages of undisputed testimony and evidence from numerous declarants concerning anticipation, and permitted Chrimar a full and fair opportunity to litigate the issues of invalidity. As this Court noted, there is "no need to start anew" in questioning these conclusions. Collateral estoppel is applicable to the *Cisco* invalidity ruling.

---

[1] Declaration of Monte M.F. Cooper ("Cooper Decl."), Ex. A.
[2] Cooper Decl., Ex. B.

## I.      FACTUAL BACKGROUND

The record supporting this Court's partial summary judgment ruling that claim 1 was anticipated by Green Book and the AMD Application Note was overwhelming. The Court ensured that Chrimar had numerous opportunities to challenge the proffered evidence, and to present its own arguments. Nonetheless, Chrimar failed to demonstrate the existence of any genuine issue of material fact that claim 1 was anticipated by both of the FDDI Publications.

### A.      The Cisco Litigation and Claim 1

In 2001, Chrimar filed a lawsuit against Cisco Systems, Inc. ("Cisco"), claiming that Cisco's IP phones, Inline Power Switches, and Power Patch Panels infringed various claims of Chrimar's '260 Patent. *See Cisco*, 318 F. Supp. 2d at 486. Although Chrimar initially alleged that Cisco's devices infringed claims 1-6, 8-12, and 14-19 of the '260 patent, the Court bifurcated representative claim 1 from all other claims at issue in the case. *See Id.*, at 481 & n.1.[3]

Representative claim 1 of the '260 patent reads as follows:

> 1.    A security system for detecting disconnection of electronic equipment from a network, said security system comprising:
>
> current loop means including separate current loops associated with different pieces of monitored equipment, each of said current loops employing a pair of data communication lines which connect one of the associated pieces of equipment to the network and which are coupled to existing internal circuitry within the associated piece of monitored equipment, and wherein respective pairs of data communication lines are associated with different ones of the associated pieces of equipment;

---

[3] Wherever possible, Defendants refer to the record in the Cisco litigation as set out in this Court's published opinion at *Cisco*, 318 F. Supp 2d. 476. Cooper Decl., Ex. C. Because the pleadings in the Cisco litigation are extensive, Defendants asks that the Court take judicial notice of the entirety of the record from the earlier Cisco litigation. *See Freshman v. Atkins*, 269 U.S. 121, 124 (1925) (Court may take judicial notice of and give effect to its own records in another, but inter-related, proceeding); Fed. R. Evid. 201. *See also* Cooper Decl. Ex. D.

> source means for supplying a low DC current signal to each of said current loops; and
>
> detector means for monitoring the current signal through each of said current loops and detecting a change in said current signal through one of said current loops which represents disconnection of said associated piece of equipment from the network.

*Cooper Decl. Ex. E*, at 6:48-68.  Significantly, Chrimar admitted "that the conception date for the '260 patent [and hence claim 1] is no earlier than November 1991."  *Cisco*, 318 F. Supp. 2d at 502.  The application for the '260 patent was filed on December 18, 1992.  *Cooper Decl. Ex. E.*, at p.1.

The Court held a *Markman* hearing in the Cisco litigation and construed various disputed terms in Claim 1.  The chart below summarizes those rulings:

| Claim Language | Court's Interpretation In *Cisco* | Corresponding Structure |
|---|---|---|
| 1. **A security system** for detecting disconnection of electronic equipment from a network, said security system comprising: | Not a limitation. | |
| **current loop means** including separate current loops associated with different pieces of monitored equipment, each of said current loops employing a pair of data communication lines which connect one of the associated pieces of equipment to the network | Multiple current loops with each loop associated with a corresponding piece of electric equipment.  Each of the current loops has a pair of data communication lines that connect the corresponding piece of electronic equipment to a network through existing internal circuitry. | |
| and which are coupled to **existing internal circuitry** within the associated piece of monitored equipment, and wherein respective pairs of data communication lines are associated with different ones of the associated pieces of equipment; | Electronic circuitry that is present in the monitored piece of electronic equipment at the time the end user acquires it. | |
| **source means** for supplying | A DC power source that is capable of generating low DC | input terminal 25 and isolation power |

| | current in the multiple current loops. | supply 26 |

| Claim Language | Court's Interpretation | Corresponding Structure |
|---|---|---|
| a **low DC current signal** to each of said current loops; | A DC current that is sufficiently low so that it does not interfere with or adversely affect the operation of the electronic equipment or computer network. | |
| **detector means** for monitoring the current signal through each of said current loops and detecting a change in said current signal through one of said current loops which represents disconnection of said associated piece of equipment from the network. | One or more electronic components capable of providing an indication of a change in current flow which represents disconnection of a piece of electronic equipment from the network. The indication need not be human-perceptible. | resistor $R_2$ |

*See Cisco*, 318 F. Supp. 2d at 486.

### 1.    Cisco's Motion for Summary Judgment of Invalidity

Cisco brought two separate motions for summary judgment contending that none of its accused products infringed claim 1, and also that claim 1 was invalid; Chrimar, meanwhile, cross-moved for summary judgment that claim 1 was infringed. *See Cisco*, 318 F. Supp. 2d at 481. Cisco's Motion for Partial Summary Judgment of Invalidity of Claim 1 was based on the Green Book and AMD Application Note references. *Id.* at 492. In conjunction with that Motion, and pursuant to the Court's earlier instructions, Cisco submitted thirty-one (31) fact and authenticating declarations with hundreds of pages of evidence that reflected that for purposes of 35 U.S.C. § 102(a), (b), and (g)(2), the FDDI publications and a May 21, 1991 public demonstration of the "cable detect" function set forth in Green Book were prior art that were enabled and disclosed every element of claim 1 of the '260 patent. *See* Cooper Decl. Exs. D[4], G.

---

[4] The Cisco docket contains 31 declarations in support of motion for summary judgment of invalidity. Due to volume, Defendants hereby move the Court to take judicial notice of their

Notwithstanding the Court's earlier instructions to Chrimar to depose any declarant to the extent it wished to challenged the veracity of their statements[5], Chrimar elected not to do so. *See Chrimar*, 318 F. Supp. 2d at 502-03.

**B.     The Court and Special Master Both Agree that Green Book and the AMD Application Note Anticipate Claim 1**

Due to the complexity of the issued involved, the Court assigned Professor Paul Janicke to act as a special master and to provide a report and recommendation ("R&R") concerning the pending motions. *See Cisco*, 318 F. Supp. 2d at 489.  Professor Janicke "received the motion papers, conferred with the parties, asked technical questions to better understand the technology, and conducted a lengthy hearing." *Id.*  He issued a detailed R&R in which he recommended that Cisco's Motion for Summary Judgment of Invalidity be granted for each of the following reasons:  (1) there were "no genuine issues of material fact" and Cisco presented "clear and convincing evidence of invalidity so that no reasonable jury could find otherwise";  (2)  claim 1 of the '260 patent was anticipated by both Green Book and the AMD Application Note under 35 U.S.C. § 102(b); (3) both of the FDDI Publications contain enabling disclosures of every limitation in claim 1;  (4) both references were "printed publications" for purposes of 35 U.S.C. § 102(b);  (5) claim 1 is invalid based on prior use under 35 U.S.C. § 102(a);  (6) claim 1 is invalid based on  prior knowledge under 35 U.S.C. § 102(a);  and (7) claim 1 is not invalid based on prior invention under 35 U.S.C. § 102(g)(2). *Id.*

Chrimar filed extensive objections, and argued that the Special Master "misunderstood the technical aspects of the claimed invention." *See Cisco*, 318 F. Supp. 2d at 490 & n. 14.  This

---

content.  Defendants are also willing to submit a copy of these materials, if the Court requests.
[5] *See* Cooper Decl. Ex. F, at 3:8-17;  4:20-6:13;  7:6-7:7;.  7:12-8:13.  The Court instructed Chrimar to take depositions, because testimony from the declarants otherwise would be "*de bene esse*" and later could be used "for trial," rather than merely for purposes of discovery or summary judgment. *Id.* at 5:2-19.

Court then held a hearing and received supplemental briefing on the invalidity and non-infringement issues. *Id.* at 490. As part of the supplemental briefing, the Court also received a videotape of a demonstration made at the hearing that attempted to prove that the Special Master erred in his invalidity conclusions concerning Green Book and the AMD Application Note. *Id.* at 500. Nonetheless, the Court overruled all of Chrimar's objections, finding that "as evidenced by the extensive papers produced by the parties explaining the technology, the detailed questions posed by the Special Master to the experts, and the Report and Recommendations itself, the Special Master clearly understood the technology involved and issued a well-reasoned and thorough report." *Id.* at 490 n.14.      Accordingly, the Court agreed with the Special Master that claim 1 was both invalid and non-infringed, and entered partial summary judgment in Cisco's favor. *Id.* at 509, 516. The Court adopted every single one of Professor Janicke's conclusions why claim 1 was anticipated by Green Book and the AMD Application Note. *See Id.* at 492-509.

### C.    The Reasons the Court Ruled that the Prior Art Anticipated Claim 1

The Court provided extensive findings supporting its summary judgment that claim 1 of the '260 patent is anticipated and invalid under 35 U.S.C. § 102. *See Cisco*, 318 F. Supp. 2d at 492-508.[6] Briefly summarized, Green Book and the AMD Application Note both were developed by a consortium of five companies: SynOptics, Inc. ("SynOptics"), Advanced Micro Devices, Inc. ("AMD"), Chipcom Corporation ("Chipcom"), Digital Equipment Corporation ("DEC"), and Motorola, Inc. ("Motorola"). *Id.*, at 493. These companies wanted to convince the ANSI X3T9.5 standards body to adopt their solution as a means to employ the high speed rates available in Fiber Distributed Data Interface ("FDDI"), a fiber optic computer network

---

[6] The particular facts surrounding the development, publication, structure and functions of Green Book are set forth in detail in the declarations submitted in support of Cisco's motion. *See* Cooper Decl. Ex. D. These facts also were summarized in Cisco's Corrected Statement of Undisputed Facts filed in the Cisco litigation. *Id.* Ex. G.

developed in the late-1980s, on the cheaper shielded pair twisted pair systems already present in most buildings. *Id.* at 492, n.19.

On May 21, 1991, AMD, Chipcom , DEC, Motorola, and SynOptics, held a public technology forum featuring a complete FDDI network that showcased the interoperability between FDDI and copper wires. *Id.* at 503-505;  507-09.  This public forum also resulted in the publication of Green Book, which was disseminated to the public both then and on several occasions thereafter, including at an ANSI X3T9.5 TP-PMD Committee meeting.  *Id.* at 493, 503-507.  In June 1991, AMD published the AMD Application Note and disseminated it widely to the public.  *Id.* at 495, 507.  These actions, among others, established that both references were prior art printed publications for purposes of 35 U.S.C. § 102(a) and (b).  *See Id.* at 502-07.

Both FDDI publications described a proposal of using copper wires in an FDDI network as an alternative to fiber optic cable. *See Id.* at 493-96.  The key to this new hybrid network was a device called an FDDI "concentrator." *Id.* at 493-94.  Concentrators have multiple "Master" or "M-ports" which connect with individual computers at their individual "Slave" or "S-ports." *Id.* at 493.  Both FDDI Publications described the use of DC current on communications lines such as the copper wire cables connected to a concentrator to detect the disconnection of each of the computers connected to the concentrator. *See Id.* at 494-96, 499-502.

Green Book contained two diagrams of model circuits that performed the "cable detect" function as part of a "link detect" function. *Id.* at 494.  The AMD Application Note included a like schematic reflecting an implementation of the cable detect circuit called "Cable Continuity Detection." *Id.* at 495.  The illustration below is taken from Green Book, and shows how the model "cable detect" function operated in both references (with color arrow added), as described by the Court:



Figure A-2 shows an alternate cable detect implementation example where a 4 mA nominal phantom current is sourced at Transmit pins of the M-Port. $V_{L1}$ is nominally at the same values as in example 1. The circuits of example 1 and 2 interoperate with each other.

**Cable Detect Implementation Example 2**
**Figure A-2**

Cf. *id.* at 494. First, a concentrator injects 5 volts of DC current from its M-port onto the data communication lines that connect the concentrator to the S-port of the computer. *Id.* at 494. This 5 volt DC source satisfied the "source means" limitation of claim 1. *Id.* at 499.

The DC current then flows through a "current loop" as the Court defined that term for claim 1, which is formed by the top pair of communication lines, the existing internal circuitry in the computer, and the bottom pair of communication lines. *Id.* at 494-95; *see id.*, 496-499.[7] Even though FDDI communications occur as part of a "logical" ring, the cabling of current loop formed in this configuration is a physical star with a one-to-one correspondence between the concentrator and the respective computers, so as to satisfy the requirement of claim 1 that

---

[7] Chrimar argues that because this Court in *Cisco* defined "current loop means" as used in claim 1 to read on "phantom" current circuits like those shown in Green Book and the AMD Application Note that use a "pair of pairs," the Court should vacate its prior interpretations of (1) "selecting respective pairs," (2) "current loop," and (3) "selectively tapping into…" *See* Plaintiff Chrimar's Brief in Support of Motion for Reconsideration, at 2-9 (Dkt. 95 in Case No. 01-74081). Defendants dispute that contention. However, if "current loops" as used in claim 14 include phantom circuits, that makes application of collateral estoppel even more compelling. *See Westwood Chem., Inc. v. Molded Fiber Glass Body Co.*, 498 F.2d 1115, 1117 (6th Cir. 1974) (that "unadjudicated claims present questions of fact identical to questions presented in the

"respective pairs" of data communication lines are "associated with different ones of the associated pieces of equipment." *Id.* at 498-99. After flowing through this loop, the DC current then returns to the concentrator's M-port. *Id.* at 495, 498-99. There, the DC current passes through a 650 Ω resistor which provides a voltage drop or "$V_{L1}$ voltage range." *Id.* at 495; *see id.*, 499-502. This 650 Ω resistor is in the same circuit position as is resistor $R_2$ of the `260 patent which the Court identified as the relevant structure for the "detector means" limitation of claim 1, and likewise carries the current through a DC current loop to produce a voltage drop representative of the magnitude of its loop current. *Id.* at 495, 499. This voltage drop will be at one level if the computer is connected, and at zero if the computer is disconnected, and reflects precisely the same use and function disclosed for resistor $R_2$ in the `260 patent. *Id.* at 495, 499, 501-02.

Thus, the Court concluded that all elements of claim 1 of the `260 patent are disclosed and enabled in both FDDI Publications, and were in use at the public demonstration of Green Book's functionality on May 21, 1991. *Id.* at 496-502, 507-08. The Court granted partial summary judgment that claim 1 was invalid pursuant to 35 U.S.C. § 102(a) and (b). *Id.* at 516.

## D.    The Court Recognized that Its *Cisco* Findings Apply to These Cases

Chrimar and Cisco settled after this ruling, and the remaining action was dismissed with prejudice. Cooper Decl., Ex. H. However, Chrimar also sued PowerDsine for infringement of the claims of the `260 patent in 2001 and then, in 2006, Chrimar brought similar suits against Foundry and D-Link. The Court ordered Chrimar to designate a paradigm claim and identify the relevant accused devices for each of the Defendants. *Id.*, Ex. I. Chrimar designated claim 16 for PowerDsine, and claim 17 for both Foundry and D-Link. *Id.* Exs. J-L. All of the defendants have averred that Green Book and the AMD Application Note anticipate claims 16 and 17, or at

adjudicated claims" is one reason to apply collateral estoppel to a prior invalidity ruling).

least render the claims obvious. *Id.*, ¶¶ 21-23.

Claim construction proceedings in all three matters were assigned to Professor Mark Lemley for the purpose of issuing another Report and Recommendation ("R&R").  Cooper Decl. Exs. M, N.  The Special Master received extensive briefing, held a hearing, and then issued his R&R as to how claims 14, 16 and 17 of the '260 patent should be construed.  *Id.*, Ex. O.  In this R&R, Professor Lemley concluded that Chrimar was collaterally estopped under Sixth Circuit law from challenging the previous interpretation of a claim term in claims 14, 16, and 17 of the '260 patent—"data  communication lines." *Id.*, Ex. O, at 13-15.  Chrimar objected to the suggested application of collateral estoppel.  *Id.*, Ex. P at 9-13.  This Court held a hearing, and issued two Orders in which it over-ruled Chrimar's objections. *Id.*, Exs. Q. R.  However, the Court elected not to resolve the collateral estoppel question at that time, but nonetheless ruled that "[t]he simple reason [not to address collateral estoppel] is that **the interpretations from claim 1 carry over to claim 14**." *Id.*, Ex. R at 6 (emphasis added).  As the Court noted, "[t]here is no need to start anew." *Id.*

## II.   DEFENDANTS SATISFY THE LEGAL STANDARDS FOR APPLICATION OF DEFENSIVE, NON-MUTUAL ISSUE PRECLUSION

The principles set forth by the Sixth Circuit for the application of non-mutual defensive collateral estoppel all are satisfied by the ruling that claim 1 of the '260 patent was anticipated by Green Book, the AMD Application Note, and the May 21, 1991 public demonstration of Green Book's functionality.  Defensive use of collateral estoppel occurs when, as in these cases, "a defendant seeks to prevent a plaintiff from relitigating an issue the plaintiff has previously litigated unsuccessfully in another action against the same or a different party." *United States v. Mendoza*, 464 U.S. 154, 159 n.4 (1984).  Chrimar should be prevented in these proceedings from re-litigating any of the facts or issues which prove: (1) Green Book is enabled prior art that

discloses each element of claim 1;  (2) the AMD Application Note is enabled prior art that discloses each element of claim 1;  and (3) the May 21, 1991 public demonstration of Green Book's functionality reflected prior public knowledge and use of claim 1.

### A.    The Sixth Circuit's Four Part Test for Application of Collateral Estoppel

Whether non-mutual defensive collateral estoppel applies to the partial summary judgment ruling in the *Cisco* litigation is a procedural issue in which the law of the Sixth Circuit controls.  *See Dana v. E.S. Originals, Inc.*, 342 F.3d at 1323 (noting collateral estoppel is governed by regional circuit law).  In the Sixth Circuit, the test for applying issue preclusion is as follows: (1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding; (2) determination of the issue must have been necessary to the outcome of the prior proceeding; (3) the prior proceeding must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.  *United States v. Cinemark USA, Inc.*, 348 F.3d 569, 583 (6th Cir. 2003) (citing four-part test).   Application of these four factors easily proves that Chrimar is prevented by collateral estoppel from relitigating any of this Court's prior invalidity rulings in the *Cisco* litigation.

### B.    Chrimar Is Collaterally Estopped from Re-Litigating that Green Book and the AMD Application Note Were Prior Art Printed Publications

Chrimar is barred from relitigating the following findings establishing that either Green Book or the AMD Application Note are prior art printed publications within the meaning of 35 U.S.C. § 102(a) and (b):

> **Finding 1**: For purposes of 35 U.S.C. § 102(a), the conception date for the '260 patent is no earlier than November 1991. For the purposes of 35 U.S.C. § 102(b), the critical date is December 18, 1991. *Cisco*, 318 F. Supp. 2d at 502.

**Finding 2**: Chrimar did not produce a single witness to dispute the facts stated in declarations by Cisco's witnesses, nor did Chrimar depose any of Cisco's witnesses. *Id.* at 502-03.

**Finding 3**: Green Book was published on May 21, 1991, when representatives from SynOptics, AMD, Chipcom, DEC, and Motorola held a technology demonstration at DEC's facilities in Littleton, Massachusetts, which demonstration was widely reported in the press, and at which demonstration Green Book was made available and disseminated without restriction to anyone who wished to receive a copy. *Id.* at 503-05.

**Finding 4**: Green Book was freely available to anyone who requested copies from DEC and SynOptics, and copies actually were mailed to individuals who made such requests. *Id.* at 504.

**Finding 5**: Green Book also was published on June 18, 1991 when the Green Book's proponents made a presentation at a public X3T9.5TP Committee Meeting in Minneapolis, Minnesota, that was attended by approximately 90 engineers. *Id.* at 505.

**Finding 6**: The voluminous evidence submitted by Cisco, which Chrimar did not dispute, conclusively demonstrated that the Green Book was publicly accessible. Green Book was reasonably available to the public interested in the art. Once the existence and availability of the Green Book were known, interested individuals had easy access to it. *Id.*

**Finding 7**: Numerous witnesses testified that the five companies freely distributed the Green Book to anyone who requested a copy, An interested individual certainly could have obtained a copy of Green Book with reasonable effort by either attending the May 21, 1991 demonstration in person, or by simply contacting any one of the five companies and asking for it. *Id.* at 505-06.

**Finding 8**: The whole purpose of the five companies' collaborative effort on the Green Book, as well as the May 21, 1991 demonstration and June 18, 1991 presentation, was to create and agree on a common circuit design for FDDI-STP interoperability so that customers could use network equipment from multiple vendors interchangeably. All of Cisco's third-party witness declarations were consistent with this underlying purpose, and Chrimar did not present any evidence that any of the "Authoring Group" of Green Book did anything contrary to this purpose. *Id.* at 506.

**Finding 9**: As a whole, the uncontroverted declarations submitted by Cisco amount to clear and convincing evidence that interested persons of ordinary skill in the art, not just the "Authoring Group," could locate the Green Book prior to November 1991 after exercising reasonable diligence. As a matter of law, the Green Book is a "printed publication" under 35 U.S.C. § 102(a) & (b). *Id.*

**Finding 10**: The AMD Application Note was published in June 1991. The document itself has an issue date of June 1991 and "Publication # 15923" on its cover. *Id.* at 507.

**Finding 11**: A primary purpose of AMD Application Note was to assist customers with new technology. It was AMD's regular business practice to publicly distribute such application notes as early as possible before the application notes came out. An AMD representative prepared a cover sheet and packet for use in responding to requests for information on FDDI-over-STP technology, which attached both the Green Book and the AMD Application Note. *Id.*

**Finding 12**: Copies of the AMD Application Note were actually provided to AMD's customers, sales force, and FAEs. Multiple copies of application notes were distributed to AMD field offices once a month so that customers could obtain copies by calling the AMD field offices. *Id.*

**Finding 13**: AMD's general policy was to use application notes as promotional tools. It sought to disseminate them as widely as possible to generate sales. The AMD Application Note was actually sent to customers, sales force, and FAEs. *Id.*

**Finding 14**: AMD published multiple application notes and made them all publicly available and indexed for retrieval. Although the AMD Application Note did not receive the level of media coverage given to Green Book, evidence of actual dissemination more than makes up for the lack of publicity An interested person of ordinary skill could locate the AMD Application Note with reasonable effort. *Id.*

**Finding 15**: As a matter of law, the AMD Application Note is a "printed publication" under 35 U.S.C. §§ 102(a) and (b). *Id.*

While there can be no question collateral estoppel attaches to these findings, there is an issue presented concerning whether either Green Book or the AMD Application Note is an

invalidating prior art reference to claims 14, 16 and 17 is at issue in this case.  Because there is overlap of claim scope, the "identicality" requirement is also met.  *In re Freeman*, 30 F.3d 1459, 1466 (Fed. Cir. 1994) (finding the identical issue was presented where both a District Court and the PTO during reexamination considered the effect of the same disputed language); *Westwood*, 498 F.2d at 1117 (that "unadjudicated claims present questions of fact identical to questions presented in the adjudicated claims" is one reason to apply collateral estoppel to a prior invalidity ruling).  Indeed, "'a *fact, question or right* distinctly adjudged in the original action cannot be disputed in a subsequent action, even though the determination was reached upon an erroneous view.'"  *Aircraft Braking Sys. Corp. v. Local 856, Int'l Union*, 97 F.3d 155, 162 (6th Cir. 1996) (quoting *Montana v. United States*, 440 U.S. 147, 162 (1979);  emphasis in original).

Likewise, each of the Court's fact findings in *Cisco* establishing that Green Book and the AMD Application Note both were widely disseminated and freely available to persons of skill in the art so as to be prior art publications were critical to the finding that both references invalidated claim 1 under 35 U.S.C. § 102(a) and (b).  *Cf. Kyocera Wireless Corp. v. ITC*, 545 F.3d 1340, 1350-51 (Fed. Cir. 2008) (finding that proposed GSM specifications were sufficiently accessible to the public interested in the art to be printed publications).  The fact findings on publication were necessary because whether an asserted anticipatory document qualifies as a printed publication is a legal conclusion based on underlying factual determinations.  *Id.* at 1350 (stating rule).  The first two requirements for applying collateral estoppel are met.

The third requirement – finality – also is met.  The Sixth Circuit follows the *Restatement (Second) of Judgments* § 13, holding that a "final judgment" is "not required so long as there has been a final decision with respect to the issue to be given preclusive effect...."  *Am. Postal Workers Union Columbus Area Local AFL-CIO v. U.S. Postal Serv.*, 736 F.2d 317, 318, 319 (6th

Cir. 1984) (citing *Restatement* and holding that an interlocutory order dismissing "some but not all of the union's claims" gave rise to collateral estoppel).  *See also Employees Own Fed. Credit Union v. City of Defiance*, 752 F.2d 243, 245 (6th Cir. 1985) (following *Restatement*, and holding that a plaintiff who voluntarily dismissed a state court suit after the court granted defendants' motion to dismiss, but before entry of judgment, was barred by issue preclusion from re-litigating identical issue in Federal Court).  Here, the Court's partial summary judgment ruling that claim 1 was invalid was "final" within the meaning of the *Restatement*.  *Cf. Dana*, 342 F.3d at 1324 (applying Eleventh Circuit law while citing *Restatement*, and holding that prior partial summary judgment orders concerning patent validity and infringement were final for purposes of collateral estoppel).

Likewise, the fourth requirement for collateral estoppel is met – Chrimar  unquestionably had a full and fair opportunity to challenge the conclusions that Green Book and the AMD Application Note were published, freely accessible, and widely disseminated.  Chrimar was admonished to take the depositions of any witness whose testimony regarding publication of either reference it disagreed with, and yet elected not to do so.  318 F. Supp. 2d at 502-03.  Instead, Chrimar "fully took advantage of [its] opportunity to have this issue decided," and that is sufficient for collateral estoppel to apply.  *Freeman*, 30 F.3d at 1467 (discussing what constitutes a "full and fair opportunity to litigate").

**C.     Chrimar Is Collaterally Estopped from Relitigating that Green Book and the AMD Application Note Are Enabled, and Disclose Every Element of Claim 1**

Chrimar also is barred from relitigating any of the following findings supporting the Court's holding that Green Book and the AMD Application Note both are enabled, and disclosed every element of claim 1:

> **Finding 17**:  The AMD Application Note contains a more detailed disclosure than the "cable detect" circuit, which is similar to that of

Green Book. Consequently, the AMD Application Note is at least as enabling as the Green Book. Every one of the Court's conclusions concerning anticipation by Green Book applies equally to the AMD Application Note. *Cisco*, 318 F. Supp. 2d at 496 n.20.

**Finding 18:** Green Book discloses multiple current loops within the meaning of claim 1, each loop including pairs of copper data communication lines contained in the cable that connect individual computers to the FDDI network via the concentrators. *Id.* at 496-499.

**Finding 19:** It is unnecessary to enable an entire "network" to satisfy the "current loop means" element of claim 1. *Id.* at 496-97. However, even if enablement of a "network" were required to satisfy the "current loop means" element of claim 1, Green Book discloses how to create a traditional local area network (LAN) by connecting a workstation to a FDDI concentrator through STP cable in a star configuration. *Id.* at 496-97.

**Finding 20:** The only changes needed to implement the Green Book in a working FDDI-over-STP network were the use of STP cables instead of optical fiber and the replacement of the optical transceiver (PMD) in the FDDI NIC with an electrical transceiver (PMD). Green Book fully discloses all of the necessary elements to make a "network" within the meaning of claim 1. *Id.*

**Finding 21:** Green Book discloses "existing internal circuitry" within the meaning of claim 1 by virtue of its disclosure of center-tapped isolation transformers. *Id.* at 498.

**Finding 22:** Green Book discloses the use of "respective pairs of data communication lines [that] are associated with different ones of the associated pieces of equipment" within the meaning of claim 1. Green Book's FDDI-over-STP implementation is a physical star configuration with logical ring flow. *Id.* at 498-99.

**Finding 23:** How the data flows in the network is irrelevant; claim 1 only requires that a physical data communication pair associated with one particular piece of equipment. *Id.* at 498.

**Finding 24:** In the "cable detect" circuit, the upper and lower pairs of wires extend from the M-port of the concentrator to the S-port of one particular piece of equipment. Further, data flows directly between the equipment and the concentrator in a FDDI-over-STP network just as it does between equipment and the hub in the '260 patent; hence, there is at least a one-to-one

correspondence between the data communication lines connecting the concentrator and the equipment from the logical perspective as well. *Id.*

**Finding 25**:  The Green Book contains an enabling disclosure of "current loop means" because it discloses a current loop over a pair of data communication lines that connect a piece of electronic equipment to a network through existing internal circuitry. Enablement of the associated network is not required.  The Green Book discloses pairs of data communication lines (STP cable) physically connected to one particular piece of equipment.  *Id.* at 499.

**Finding 26**:  The Green Book uses a 5 volt DC power supply to inject a low DC current onto the data communication lines, which power supply corresponds to input terminal 25 and isolation power supply 26 in the '260 patent.  Hence, there is a source means in Green Book.  *Id.*

**Finding 27**:  The 650 ohm resistor in Green Book is a "detector means" because it is in the same circuit position as resistor $R_2$ in the '260 patent and different voltages are applied across it depending on whether current is flowing in the loop.  Here, the 650 ohm resistor is capable of providing an indication of a change of current flow from 2.5 V to 0 V, which represents disconnection of a computer.  That is all that is necessary to meet the "detector means" limitation of claim 1.  *Id.* at 501, 502.

**Finding 28**:  In Green Book, the circuitry downstream of the 650 ohm resistor that measures the $V_{L1}$ voltage signal is irrelevant to whether the 650 ohm resistor is a detector means.  Like the '260 patent, circuitry downstream of a resistor determines how to respond to a change in current signal.  However, that circuitry is not part of the corresponding "detector means" in the '260 patent. *Id.* at 501.

**Finding 29**:  The "cable detect" circuit checks the $V_{L1}$ voltage signal to determine if a computer is disconnected – it is 2.5 V when connected and 0 V when disconnected.  Chrimar's own demonstration to the Court at the hearing on Chrimar's objections to the Special Master's R&R confirmed that the Green Book works for this purpose because an alarm sounded when the computer was disconnected from the cable.  *Id.*

**Finding 30**:  The fact that later circuitry can also detect the operation of a wrap-back connector (through a 4.3 V signal) does not mean the 650 ohm resistor is not a "detector means."  The 650

ohm resistor is still capable of providing an indication of a change in current flow from 2.5 V to O V, which represents disconnection of a computer. When wrap-back connectors are not used, there are only two possible $V_{L1}$ voltage levels. In that case, the 650 ohm resistor would operate exactly the same as the resistor $R_2$ if the alarm circuitry of the '260 patent preferred embodiment were added downstream. *Id.* at 501-02.

**Finding 31**: Green Book does not say that the use of wrap-back connectors is essential; it merely says it is "likely" that a cable with wrap-back connectors will be used. Chrimar produced no testimony from anyone knowledgeable with the creation of Green Book who claimed the sole embodiment of the Green Book used wrap-back connectors. *Id.* at 502.

**Finding 32**: Reducing the Green Book to practice and then substituting it for part of the '260 patent preferred embodiment to see if that circuit still "works" is not an appropriate mode of analysis for anticipation. *Id.* Anticipation must be determined by comparing the anticipatory reference to the language of the claim as interpreted by the Court. *Id.*

**Finding 33**: The Green Book contains an enabling disclosure of "detector means" because the disclosed "cable detect" circuit is capable of providing an indication of a change in current flow which represents disconnection of a piece of electronic equipment from the network. The additional capabilities of detecting the operation of a wrap-back connector does not mean that the Green Book does not anticipate the claimed invention. *Id.*

"Anticipation is a factual matter," and "[a] claim is anticipated and therefore invalid only when a single prior art reference discloses each and every limitation of the claim." *Glaxo, Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047 (Fed. Cir. 1995). There is thus no question collateral estoppel attaches to each of the Court's fact findings that proved Green Book and the AMD Application Note are enabled and anticipate claim 1 element-for-element. The identical issue of whether Green Book and the AMD Application Note anticipate the asserted claims of the '260 patent is at issue in these cases, and the Court's earlier conclusions were necessary to the entry of partial summary judgment on the same question. "[W]here a determination of the scope of patent claims was made in a prior case, and the determination was essential to the judgment there

on the issue of infringement, there is collateral estoppel in a later case on the scope of such claims, i.e., the determined scope cannot be changed." *Molinaro v. Fannon/Courier Corp.*, 745 F.2d 651, 655 (Fed. Cir. 1984) (affirming summary judgment based upon application of collateral estoppel). The Court's partial summary judgment invalidity ruling was "final" within the meaning of the *Restatement*, and given the extraordinary procedures employed, including reference to a Special Master and permitting the parties to file post-hearing supplemental briefs, Chrimar received a full and fair opportunity to litigate the issues of whether Green Book and the AMD Application anticipated claim 1. *Cf. Dana*, 342 F.3d at 1324 (applying collateral estoppel to a partial summary judgment validity finding). Collateral estoppel applies to each of the findings concerning anticipation.

### D.   Chrimar Is Collaterally Estopped from Relitigating that Green Book Was Known and Used for Purposes of 35 U.S.C. § 102(a)

Chrimar also is barred from relitigating the following findings that proved Green Book anticipated claim 1 pursuant to 35 U.S.C. § 102(a) through public knowledge and prior use:

> **Finding 34**: The May 21, 1991 demonstration of the Green Book circuit constituted prior use. Numerous witnesses said that the demonstration was public. It is clear that the demonstrators did not specifically limit attendance to members of the five companies. The demonstration and announcement were advertised in the May 20, 1991 issue of *Communications Week*. *Cisco*, 318 F. Supp. 2d at 507-08.

> **Finding 35:** At the May 21, 1991 technology demonstration, DEC, Chipcom, and SynOptics each provided concentrators, and all five companies provided computer workstations. As demonstrated on May 21, 1991, each concentrator used multiple DC current loops originating at the M-ports of concentrators and extending over copper wires to the associated S-ports of individual computers which implemented the cable detect function of Green Book. There, each concentrator used was connected to multiple computers forming a LAN. Thus, Chrimar admitted that the demonstration "implemented" the Green Book's "cable detect" circuit, which itself anticipates claim 1. *Id.* at 508.

**Finding 36:** Numerous witnesses confirmed that the demonstration worked to implement the solution set forth in the Green Book, including the "cable detect" circuit.  Hence, the May 21, 1991 demonstration constituted public use of a circuit with one or more electronic components capable of providing an indication of a change in current flow which represents disconnection of a piece of electronic equipment from the network.  *Id.*

**Finding 37**:  Regarding the knowledge component of 35 U.S.C. § 102(a), because the Green Book and the AMD Application Note were publicly accessible as "printed publications," they were also sufficiently available as public knowledge.  The May 21, 1991 demonstration shows the state of public knowledge at the time.  *Id.*

**Finding 38**:  Public use and knowledge under 35 U.S.C. § 102(a) constitute additional grounds for invalidating claim 1 of the '260 patent.  *Id.*

These findings bind Chrimar for all of the same reasons that the Court's conclusions concerning anticipation by Green Book and the AMD Application Note bind Chrimar.  The public use and prior knowledge issues are identical to the anticipation issues in this case, were necessary to the invalidity ruling in the *Cisco* litigation, constitute a final judgment under Sixth Circuit law, and were entered only after Chrimar was presented a full and fair opportunity to litigate.  *Cinemark*, 348 F.3d at 583 (explaining four-part test for application of collateral estoppel).  Again, collateral estoppel attaches to the Court's invalidity ruling in *Cisco*.

## III.   CONCLUSION

Defendants respectfully request entry of an Order barring Chrimar from relitigating facts established in the Court's partial summary judgment order granting Cisco's motion that claim 1 of the '260 patent is invalid based on the disclosures of the Green Book and AMD Application Note prior art references and the May 21, 1991 public demonstration.

Dated: October 6, 2009                    Respectfully submitted,


                                          By: /s/ Monte M.F. Cooper
                                          _____
                                              Monte M.F. Cooper (*admitted pro hac vice*)
                                              mcooper@orrick.com
                                              William L. Anthony, Jr. (P10222)
                                              wanthony@orrick.com
                                              Zheng Liu (*admitted pro hac vice*)
                                              jenliu@orrick.com
                                              ORRICK, HERRINGTON & SUTCLIFFE LLP
                                              1000 Marsh Road
                                              Menlo Park, CA 94025
                                              Telephone:   (650) 614-7400
                                              Facsimile:   (650) 614-7401

                                              Herschel Fink (P13427)
                                              hfink@honigman.com
                                              HONIGMAN MILLER SCHWARTZ & COHN LLP
                                              2290 First National Building
                                              660 Woodward Avenue
                                              Detroit, MI 48226
                                              Telephone:   (313) 465-7400
                                              Facsimile:   (313) 465-7401

                                              *Attorneys for Defendants*
                                              *POWERDSINE LTD., POWERDSINE CORP. AND*
                                              *D-LINK SYSTEMS, INC.*

Dated: October 6, 2009                    Respectfully submitted,


                                          By: /s/ Robert F. Kramer
                                          _____
                                              Robert F. Kramer
                                              kramerR@howrey.com
                                              Henry C. Bunsow
                                              bunsowh@howrey.com
                                              K.T. Cherian
                                              cheriank@howrey.com
                                              HOWREY LLP
                                              525 Market Street, Ste. 3600
                                              San Francisco, CA 94105
                                              Telephone:   (415) 848-4900
                                              Facsimile:   (415) 848-4999

Fred K. Hermann (P49519)
fkh@krwlaw.com
William A. Sankbeil (P19882)
was@krwlaw.com
KERR, RUSSELL AND WEBER, PLC
Detroit Center
500 Woodward Avenue, Ste. 2500
Telephone:   (313) 961-0200
Facsimile:   (313) 961-0388

*Attorneys for Defendant*
*FOUNDRY NETWORKS, INC.*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, the foregoing was served on all counsel who have consented to electronic service.  Local Rule CV-5(a)(3)(A).  Pursuant to Fed. R. Civ. P. 5(d) and Local Rule CV-5(d), all others not deemed to have consented to electronic service will be served with a true and correct copy of the foregoing via email or U.S. mail.

Dated:  October 6, 2009                              Respectfully submitted,


                                        /s/ Monte M.F. Cooper
                                        Monte M.F. Cooper